AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| United States of America | |
| v. | |
| FILIPPO GAUDENZI, | Case No.  2:23-mj-00992-DUTY |
| Defendant | |

**LODGED**
CLERK, U.S. DISTRICT COURT
3/2/2023
CENTRAL DISTRICT OF CALIFORNIA
BY: ___ CO ___ DEPUTY

**FILED**
CLERK, U.S. DISTRICT COURT
March 2, 2023
CENTRAL DISTRICT OF CALIFORNIA
BY: _____ CLD ___ DEPUTY

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of March 1, 2023 in the county of Los Angeles in the Central District of California, the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 1029(a)(2) | Use of unauthorized access devices |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*/s/*
*Complainant's signature*

Attested to by the applicant in accordance with Fed.
R. Crim.P. 4.1 by telephone
~~Sworn to before me and signed in my presence.~~

Teresa Healy, Special Agent
*Printed name and title*

Date:    March 2, 2023

_____
*Judge's signature*

City and state:    Los Angeles, California

Hon. Alka Sagar , U.S. Magistrate Judge
*Printed name and title*

AUSAs: Laura A. Alexander (x1019), Haoxiaohan Cai, (x0762)

## AFFIDAVIT

I, Teresa Healy, being duly sworn, declare and state as follows:

### PURPOSE OF AFFIDAVIT

1.    This affidavit is made in support of a criminal complaint against an individual currently known to law enforcement as Filippo Gaudenzi ("GAUDENZI") for a violation of 18 U.S.C. § 1029 (a)(2) (use of unauthorized access devices).[1]

2.    This affidavit is also made in support of an application for a warrant to search a Motorola cellular phone, with IMEI number 355566110742435, retrieved from a white Ford Mustang convertible sedan bearing California license plate number 8WFJ852, and in the custody of the United States Secret Service ("USSS"), in Los Angeles, California (the "SUBJECT DEVICE"), as described in Attachment A.

3.    The requested search warrant seek authorization to seize evidence, fruits, or instrumentalities of violations of 18 U.S.C. §§ 371 (Conspiracy), 1028 (Fraud and Related Activity in Connection with Identification Documents, Authentication Features, and Information), 1029 (Fraud and Related Activity in Connection with Access Devices), 1344 (Bank Fraud), and 1028A (Aggravated Identity Theft) (collectively, the "Subject Offenses"), as described more fully in Attachment B.

---

[1] As discussed below, GAUDENZI provided the name "Filippo Gaudenzi" to law enforcement when arrested.  However, law enforcement believes this to be an alias based on false and fraudulent documents presented to law enforcement.  For purposes of this affidavit, and the criminal complaint, I will refer to the individual by the name he presented to law enforcement upon arrest, GAUDENZI.

4.    Attachments A and B are incorporated herein by reference.

5.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and search warrants, and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## BACKGROUND OF AFFIANT

6.    I am a Special Agent ("SA") with the United States Secret Service ("USSS") and have been so employed since April 2016.  In this capacity, I am responsible for investigating violations of federal criminal laws relating to financial institution fraud, credit card fraud, bank fraud, cybercrimes, and identity theft.  I am a graduate of the Criminal Investigator Training Program conducted at the Federal Law Enforcement Training Center in Glynco, Georgia, as well as the USSS Special Agent Training Course in Beltsville, Maryland.  I have received advanced training in financial and cybercrime investigations including the Basic Investigation of Computers and Electronic Crimes Program, Basic Network Intrusion Responder Training, and I have received continued education related to the investigation and prosecution of cybercrimes.  I have

participated in multiple investigations in connection with fraud and cybercrimes.

### SUMMARY OF PROBABLE CAUSE

7.    Between August 2022 and January 2023, the California Department of Social Services ("DSS") has detected more than $38.9 million in stolen funds from victim Electronic Benefit Transfer ("EBT") cards.  Much of this fraud is from two specific programs known as CalFresh and CalWORKs, which help low-income households pay for housing, food, and other necessary expenses. Many of the fraudulent withdrawals are done at specific ATMs in the Central District of California.

8.    For example, between on or about January 1, 2023, and on or about January 5, 2023, more than approximately $117,000 was withdrawn from ATMs at a single financial institution branch located in Toluca Lake, California in Los Angeles County.  The unauthorized withdrawals conducted during these five days and at this single bank branch affected approximately 152 victim EBT cardholders.  The dates of these withdrawals coincided with the disbursement by DSS of CalFresh and CalWORKs benefits to EBT cardholders.

9.    Law enforcement has also reviewed ATM surveillance provided by financial institutions that administer EBT accounts that relate to the fraud scheme at issue.  During the unauthorized ATM withdrawals, suspects can often be seen holding stacks of cards and conducting withdrawals from multiple accounts in quick succession at one ATM.

10.   On or about March 1, 2023, at approximately 4:15 a.m., law enforcement began conducting physical surveillance at a U.S. Bank ATM terminal located at 19500 Ventura Blvd, Tarzana, CA 91356 (the "Tarzana ATM"), which was identified by DSS as one of the top ATM locations for EBT fraud.  GAUDENZI arrived in a white Ford Mustang convertible sedan bearing California license plate number 8WFJ852 (the "Mustang") and proceeded to the ATM terminal located at the U.S. Bank branch where law enforcement was conducting surveillance.  At the Tarzana ATM, law enforcement observed, and U.S. Bank confirmed that, GAUDENZI withdrew $4,020 in cash in rapid succession through seven transactions, using approximately seven different access devices belonging to other individuals, in amounts ranging from $360 to $800.  GAUDENZI was arrested at 7:54 a.m. at the Tarzana ATM. Law enforcement searched GAUDENZI and recovered from his right front jacket pocket the seven access devices he used to make withdrawals from the Tarzana ATM, as well as approximately $4,020 in cash.  Law enforcement also recovered from GAUDENZI's wallet, which he was holding in his left hand at the time he was detained, approximately four additional access devices, two Italian identification cards that law enforcement determined to be fictitious, and $86.00 in cash.  Law enforcement searched GAUDENZI's Mustang, which was unlocked and parked approximately ten feet away from the Tarzana ATM, and retrieved the SUBJECT DEVICE and approximately $32,000 in U.S. currency from the center console.

## STATEMENT OF PROBABLE CAUSE

11.  Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

### Regulatory Background of CalFresh and CalWORKs Programs

12.  DSS is a government agency that administers several benefit and assistance programs for residents of the state of California.  One of the assistance programs administered by DSS is called CalFresh (formerly known as food stamps), which helps low-income households purchase food and household items to meet their nutritional needs.  Another assistance program administered by DSS is called CalWORKs, which helps low-income families with children pay for housing, food, and other necessary expenses.

13.  Residents of California that meet the criteria established by the CalFresh or CalWORKs programs can apply online for benefits at www.getcalfresh.org and www.benefitscal.com.  Beneficiaries apply for benefits by submitting their income and number of dependents to determine their benefit eligibility.

14.  CalFresh and CalWORKs benefits are issued through Electronic Benefit Transfer cards ("EBT cards").  EBT cards are mailed to an address designated by the account holder and function like traditional debit cards to conduct transactions. For example, you can use an EBT card to make a purchase at a grocery or convenient store by swiping the card at a point-of-sale terminal.

15.   The EBT cards issued under CalFresh and CalWORKs are assigned specific Bank Identification Numbers ("BIN").  A BIN refers to the first five digits of the account number on a debit or credit card and can be used to identify the issuer of the card, like DSS, which administers the CalFresh and CalWORKs programs.

16.   Benefits received through the program are typically disbursed to EBT cardholders by DSS during the early days of each month.  Those benefits are deposited directly from DSS into the account of the EBT cardholder.

17.   The EBT cardholders can then conduct cash withdrawals at automated teller machines ("ATMs") using a personal identification number ("PIN") established by the card holder. The EBT cardholder presents the card at an ATM, inserts the card into the ATM card reader, and utilizes a PIN to withdraw the funds previously deposited by DSS intended for beneficiaries of the CalFresh or CalWORKs programs.

**Background on EBT Fraud in the Los Angeles Area and Prior State and Federal Operations**

18.   Since in or about August 2022, local law enforcement has been working with DSS to investigate a significant increase in unauthorized cash withdrawals utilizing EBT cards.  Based on analysis of victim complaints to DSS, victim complaints to local law enforcement, bank records, and surveillance, law enforcement determined that the majority of the unauthorized cash withdrawals were being conducted with cloned cards.

19.   A cloned card can be a blank white plastic card or another debit, credit or gift card that contains altered information on the card's magnetic stripe.  Based on my training and experience, I know that suspects will often clone cards by taking stolen card information from a victim card's magnetic stripe and re-encode that stolen information onto another card's magnetic stripe.  Cloning these cards allows the suspect to use the card and the DSS benefits added on to the account linked to the card for illicit purchases or unauthorized cash withdrawals.

20.   On a legitimate debit or credit card, the information coded on the card's magnetic stripe will match the information embossed on the front of the card.  This information includes the account number, expiration date, and cardholder's name, among other information.  Whereas on a cloned card, the information coded on the magnetic stripe will not match the information embossed on the front of the card.  For example, if a suspect re-encodes victim EBT card information onto a pre-existing gift card's magnetic stripe or a blank white plastic card with a magnetic stripe, the magnetic stripe will be coded with the EBT card information, but the card itself will still bear the information of the gift card or bear no information if it is a blank white plastic card.

21.   Based on my training, experience, and participation in this investigation, I know that the victim card data harvested to clone cards is often obtained from what is colloquially referred to as "skimming activity."

22.  The term "skimming" is used to describe activity that involves unlawfully obtaining debit and credit card information by using technological devices to surreptitiously record victim accountholder's debit and credit card numbers and personal identification numbers at, for example, ATMs or point-of-sale terminals.  For example, individuals conducting ATM "skimming" may install a skimming device into the card reader of the ATM to record the debit or credit card numbers, as well as a camera or keypad overlay on the ATM keypad to record the associated PIN number.  Those individuals will then return to the ATM to collect the card number and PIN information stored on the installed device.

23.  As described above, suspects then manufacture cloned and fraudulent debit or credit cards that bear the victim accountholder's account information that was obtained from skimming.  Once that information is loaded onto another fraudulent card (e.g., a gift card or blank plastic card), members of the scheme then use that fraudulent card to withdraw cash from the victim accountholder's bank accounts or to make purchases with the victim accountholder's account.

24.  In or about September 2022, local law enforcement conducted a surveillance and arrest operation in the Los Angeles, California area.  This operation was planned in response to the large number of unauthorized withdrawals occurring at ATMs in the Los Angeles area during a short period of time.  Specifically, law enforcement had analyzed fraudulent EBT withdrawal data and noticed a high volume of unauthorized

withdrawals on specific dates and times that coincided with the dates when the majority of benefits are disbursed to EBT cardholders.

25.  As a result of this operation, local law enforcement established surveillance at select ATMs that were used to conduct a significant volume of EBT fraud.  Law enforcement surveilled those ATMs around the dates when benefits had been disbursed, observed suspects that withdrew a high volume of unauthorized withdrawals and that conducted those withdrawals in rapid succession, and arrested multiple individuals believed to be making fraudulent withdrawals of EBT benefits.  As a result, law enforcement arrested approximately 16 suspects.  All of the arrested suspects were later determined to be citizens of countries other than the United States who did not have documentation to be lawfully present in the United States.  All of the individuals arrested were released from local custody within hours of their arrest and absconded from any future judicial proceedings.

26.  In or about February 2023, in response to a further increase in unauthorized cash withdrawals utilizing EBT cards after the local law enforcement September 2022 operation, federal law enforcement conducted a similar surveillance and arrest operation in the Los Angeles, California area.  Law enforcement established surveillance around the dates when benefits had been disbursed at select high-volume EBT fraud ATMs.  Law enforcement arrested three suspects that withdrew a high volume of unauthorized withdrawals and that conducted those

withdrawals in rapid succession.  Two of those defendants came to the ATM together, possessed 35 cloned EBT cards at the time of arrest, and later analysis of historic ATM surveillance data showed that they had made more than $190,000 in past attempted fraudulent EBT withdrawals from a single bank since October 2022.  One additional defendant possessed 269 cloned EBT cards at the time of arrest, and later analysis of historic ATM surveillance data showed that the defendant had made more than $70,000 in past attempted fraudulent EBT withdrawals from a single bank since January 2023.  All three of these defendants were determined to be citizens of Romania, who did not have documentation to be lawfully present in the United States.  The three arrested defendants were ordered detained pending trial by the Hon. Karen Stevenson and Hon. Margo A. Rocconi.  A federal grand jury returned two indictments against the three defendants for bank fraud, in violation of 18 U.S.C. § 1344; aggravated identity theft, in violation of 18 U.S.C. § 1028A; use of unauthorized access devices, in violation 18 U.S.C. § 1029(a)(2); and possession of unauthorized access devices, in violation of 18 U.S.C. § 1029(a)(3), in 23-CR-0076-FLA and 23-CR-0077-JFW.

**Background of Current Operation to Combat EBT Fraud**

27.  Data provided by DSS, based in part upon reported fraud by victims, reported fraud to local law enforcement, bank records, and surveillance indicates that as of in or about January 2023, there has been approximately $71.3 million in stolen funds from victim EBT cards.

28.   For the previous six months, between in or about August 2022 and in or about January 2023, in the Central District of California and elsewhere, more than approximately $38.9 million has been stolen from victim EBT cards.  The majority of these funds were stolen through unauthorized ATM withdrawals.

29.   Between on or about January 1, 2023, and on or about January 5, 2023, more than approximately $7.2 million was stolen from victim EBT cards largely through unauthorized ATM withdrawals.  Of the approximately $7.2 million stolen from victim EBT cards in the beginning of January 2023, more than approximately $2.9 million was stolen, almost entirely through unauthorized ATM withdrawals, in Los Angeles County alone.

30.   For example, between on or about January 1, 2023, and on or about January 5, 2023, more than approximately $117,000 was withdrawn from ATMs at a single financial institution branch located in Toluca Lake, California in Los Angeles County.  The unauthorized withdrawals conducted during these five days and at this single bank branch affected approximately 152 victim EBT cardholders.  The dates of these withdrawals coincided with the disbursement by DSS of EBT benefits, including CalFresh and CalWORKs.

31.   Based upon my training and experience conducting access device fraud investigations, I know that suspects committing access device fraud schemes will often target particular BINs when harvesting stolen card information collected from skimming devices.  Thus, suspects using skimming

may target the BIN associated with DSS, in essence, targeting CalFresh and CalWORKs benefits.  Moreover, based upon my training and experience, the sheer volume of unauthorized ATM withdrawals occurring during the early days of the month is further indicative that suspects participating in the fraud scheme at issue are targeting EBT cards because benefits are typically disbursed to EBT cardholders during the early days of each month.

32.  Law enforcement has also reviewed ATM surveillance provided by financial institutions that administer EBT accounts that relate to the fraud scheme at issue.  During the unauthorized ATM withdrawals, suspects can often be seen holding stacks of cards and conducting withdrawals in quick succession at one ATM.  Based upon my training and experience, I know that suspects perpetrating access device fraud schemes will often conduct unauthorized withdrawals using cloned cards in rapid succession at ATMs.

33.  Based upon the rapid succession of unauthorized ATM withdrawals being conducted, the fact that the cards being used to conduct the unauthorized cash withdrawals are nearly all cloned EBT cards, and the fact that nearly all of the unauthorized withdrawals are happening during the early days of the month, I believe that suspects participating in the fraud scheme at issue are ostensibly targeting EBT cards.

**GAUDENZI Committed EBT Fraud Using Unauthorized Access Devices on March 1, 2023**

34.   Based upon the large dollar amount being stolen from victim EBT cards, the number of victims impacted, the concentration of unauthorized ATM withdrawals occurring in particular areas, and the large number of unauthorized ATM withdrawals occurring at singular bank locations, law enforcement conducted a surveillance and arrest operation in March 2023.

35.   On or about March 1, 2023, law enforcement was conducting physical surveillance at various bank and ATM locations throughout Los Angeles County, including the Tarzana ATM, which was identified as one of the top ATM locations in Los Angeles for EBT fraud.  Based on DSS fraud data, surveillance was conducted beginning at approximately 4:15 a.m.

36.   DSS reported to law enforcement that CalFresh and CalWORKS benefits had been disbursed into the EBT accounts at approximately 12:00 a.m. on March 1, 2023.

37.   During this surveillance, law enforcement observed an unknown individual, who later identified himself as GAUDENZI, arrive in the Mustang at approximately 7:04 a.m. and approach the Tarzana ATM at approximately 7:07 a.m.  Law enforcement observed GAUDENZI in the driver's seat of the Mustang.

38.   After GAUDENZI exited the Mustang and approached the Tarzana ATM, law enforcement observed GAUDENZI conduct multiple transactions which appeared to be withdrawals based upon law enforcement observing GAUDENZI retrieve what appeared to be

currency at the conclusion of each transaction.  GAUDENZI
appeared to conduct several withdrawal transactions in rapid
succession while law enforcement observed for approximately ten
minutes.  GAUDENZI appeared to insert several different cards to
conduct withdrawals and put the retrieved currency and cards in
his jacket pocket on multiple occasions.  Based upon my training
and experience, individuals conducting legitimate transactions
at ATMs typically conduct a single transaction and do not
transition between multiple payment cards rapidly to conduct
several transactions in a short period of time.  In addition,
law enforcement observed that on four occasions, GAUDENZI
discarded on the ground paper receipts printed by the Tarzana
ATM.  These ATM receipts were later retrieved by law enforcement
and were confirmed by U.S. Bank to correspond to four balance
inquires made by GAUDENZA for four different EBT accounts
bearing time stamps between 7:08 a.m., and 7:12 a.m., March 1,
2023.

    39.  Based on my training and experience, unauthorized EBT
card users often conduct balance inquiries before withdrawing
funds from EBT accounts at ATMs in order to: (1) withdraw the
maximum possible amount of funds, and (2) avoid being declined
by the bank associated with the ATM for insufficient funds.

    40.  Law enforcement learned from U.S. Bank that GAUDENZI's
first withdrawal transaction at the Tarzana ATM took place on an
EBT account belonging to an individual named A.O.  Law
enforcement subsequently confirmed with California's Department
of Motor Vehicles ("DMV") that the individual conducting the ATM

withdrawals did not appear to match the DMV photograph of A.O. At the ATM, GAUDENZI then made approximately six additional transactions on EBT accounts belonging to additional victims, which, together with the transaction from A.O.'s EBT account, totaled approximately $4,020. Notably, GAUDENZI made four of those transactions immediately after performing balance checks on the EBT accounts associated with the withdrawals. Specifically, at 7:08 a.m., GAUDENZI requested a balance inquiry on an EBT account ending in 7360, which had an available balance of $602.10, as reflected on the printed receipt retrieved by law enforcement. Less than a minute later, GAUDENZI withdrew $600 from that EBT account. Similarly, at 7:09, GAUDENZI requested a balance inquiry on an EBT account ending in 9318, which had an available balance of $597.11, and less than a minute later, GUADENZI withdrew $580 from that account. GAUDENZI repeated a similar pattern for the other two balance inquiries he performed.

41. Based on the date, time, ATM location, presence of multiple, and successive ATM withdrawals and balance inquiries made on multiple EBT cardholder accounts during a short time period, law enforcement detained GAUDENZI in order to investigate further.

42. Law enforcement searched GAUDENZI's person and recovered approximately seven EBT cards from GAUDENZI's pocket, and approximately four additional cloned cards from his wallet, which GAUDENZI was holding in his left hand at the time he was detained. Approximately nine of the cards were confirmed to be

15

cloned EBT cards.  The cloned cards consisted of a variety of
re-encoded prepaid cards and gift cards.

43.  Law enforcement confirmed these were cloned EBT cards
belonging to other individuals, not GAUDENZI.

44.  GAUDENZI also had approximately $4,106 in cash on his
person, which is close in value to the approximately $4,020 in
total unauthorized ATM withdrawals GUADENZI made that morning.
ATM surveillance photographs obtained by law enforcement also
depicted GAUDENZI at the ATM conducting the unauthorized
withdrawals using cloned EBT cards and corroborated law
enforcement's surveillance observations.

45.  When asked to identify himself, GAUDENZI provided the
name "Filippo Gaudenzi," and produced two identification
documents purporting to be official documents from Italy,
bearing his name and a birth date of April 26, 2000.  The USSS
Rome office confirmed these identification documents are
fictitious.  The USSS Europol office also confirmed that the
name "Filippo Gaudenzi" is not known to the Italian authorities.

46.  Based on my training and experience, I know that
criminals conducting access device fraud schemes will often
conceal their true identities by obtaining fictitious IDs to
enter the country illegally while evading law enforcement.

47.  ICE further confirmed that an individual with
GAUDENZI's name had no lawful presence in the United States.

48.  Based on my review of law enforcement database
records, an individual with GAUDENZI's had no known criminal
history in the United States.  However, because I believe

GUADENZI to have provided false documents and an alias, I currently am unaware whether GUADENZI has a criminal history either in the United States or elsewhere.

49.   Law enforcement learned through additional investigation that GAUDENZI is also suspect in a Beverly Hills Police Department investigation.  In September 2022, a suspect matching GAUDENZI's appearance  was captured on an ATM surveillance camera installing a skimming device on an ATM machine.

50.   The morning of March 1, 2023, after law enforcement witnessed GAUDENZI's activity at the Tarzana ATM, he was arrested, read his Miranda warning, and chose not to speak with law enforcement.

51.   Law enforcement searched the Mustang, which law enforcement saw GAUDENZI drive to, and park, at the Tarzana ATM location.  Law enforcement found approximately $32,000 in U.S. currency inside the center console compartment of the Mustang. Law enforcement also found the SUBJECT DEVICE in the Mustang, near the front center console.

52.   During the search of the Mustang, law enforcement also located a car rental agreement and three car rental extension agreements for a Hyundai Palisade sedan ("Hyundai") in the center console of the Mustang.  The agreements were between EZ2 Rent-A-Car, located at 519 West Chapman Avenue, Anaheim, California 92802 ("EZ2 Rent-A-Car"), and "Gheorge Stefan," and together leased the Hyundai to "Gheorge Stefan" from December 12, 2022 to March 8, 2023.  Law enforcement conducted a records

check for "Gheorge Stefan" using the address listed for him on the rental agreements, 441 S Alandale Avenue, Los Angeles, CA 90036, and determined that "Gheorge Stefan" was not associated with this address.  I therefore believe that "Gheorge Stefan" made be another alias used by GAUDENZI in order to avoid detection by law enforcement.  Law enforcement also determined that the Mustang driven by GAUDENZI was rented from the same rental company, EZ2 Rent-A-Car.

### TRAINING AND EXPERIENCE REGARDING IDENTITY THEFT CRIMES

53.  Based on my training and experience and information obtained from other law enforcement officers who investigate identity theft, I know the following:

a.  It is common practice for individuals involved in identity theft, bank fraud, and access device fraud crimes to possess and use multiple digital devices at once.  Such digital devices are often used to facilitate, conduct, and track fraudulent transactions and identity theft.  Suspects often use digital devices to perpetrate their crimes due to the relative anonymity gained by conducting financial transactions electronically or over the internet.  They often employ digital devices for the purposes, among others, of: (1) applying online for fraudulent credit cards; (2) obtaining or storing personal identification information for the purpose of establishing or modifying fraudulent bank accounts and/or credit card accounts; (3) using fraudulently obtained bank accounts and/or credit card accounts to make purchases, sometimes of further personal information; (4) keeping records of their crimes;

(5) researching personal information, such as social security numbers and dates of birth, for potential identity theft victims; and (6) verifying the status of stolen access devices.

b.   Oftentimes identity thieves take pictures of items reflecting their stolen identities, including items retrieved from stolen mail or mail matter, with their cellphones.

c.   It is also common for identity thieves to keep "profiles" of victims on digital devices.  Such "profiles" contain the personal identifying information of victims, such as names, Social Security numbers, dates of birth, driver's license or state identification numbers, alien registration numbers, passport numbers, and employer or taxpayer identification numbers.  Identity thieves often keep such information in their cars, storage units, and in their digital devices.

d.   It is common for identity thieves, and individuals engaged in bank fraud, access device fraud, and identification document fraud to use equipment and software to print credit and identification cards, to create magnetic strips for credit cards, to use embossing machines to create credit cards, to use laser printers to create checks, and to use magnetic card readers to read and re-encode credit cards.  These types of devices are routinely kept where the person will have easy access to such devices, such as on their person or in their cars or homes or storage units.  Software relevant to such schemes can also often be found on digital devices, such as computers.

19

e.   Based on my training and experience, I know that individuals who participate in identity theft, bank fraud, and access device fraud schemes often have co-conspirators, and often maintain telephone numbers, email addresses, and other contact information and communications involving their co-conspirators in order to conduct their business.  Oftentimes, they do so on their digital devices.  Suspects often use their digital devices to communicate with co-conspirators by phone, text, email, and social media, including sending photos.  Suspects may also have paper copies of such records, which they may keep on their person or in their cars, homes, or storage units.

f.   Individuals engaged in mail and identity theft often use multiple digital devices, which they may keep on their person or in their cars or homes.

### TRAINING AND EXPERIENCE ON DIGITAL DEVICES[2]

54.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

---

[2] As used herein, the term "digital device" includes the SUBJECT DEVICE as well as any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and

who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.  Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

55.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.  Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.  Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of

data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

56. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a. Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b. In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

c.    Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress GAUDENZI's thumb and/or fingers on the device(s); and (2) hold the device in front of GAUDENZI's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

57.    Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## CONCLUSION

58.    For all of the reasons described above, there is probable cause to believe that GAUDENZI has committed a violation of 18 U.S.C. § 1029(a)(2) (use of unauthorized access devices).  There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICE as described in Attachment A.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 2nd  day of
March, 2023.


_____
THE HONORABLE ALKA SAGAR
UNITED STATES MAGISTRATE JUDGE

24

## **ATTACHMENT A**

PROPERTY TO BE SEARCHED

A Motorola cellular phone, with IMEI number 355566110742435, in the custody of the United States Secret Service ("USSS"), in Los Angeles, California, and pictured below ("SUBJECT DEVICE").



**ATTACHMENT B**

I.   **ITEMS TO BE SEIZED**

1.   The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. §§ 371 (Conspiracy), 1028 (Fraud and Related Activity in Connection with Identification Documents, Authentication Features, and Information), 1029 (Fraud and Related Activity in Connection with Access Devices), 1344 (Bank Fraud), and 1028A (Aggravated Identity Theft), namely:

a.   Access devices, access card skimming devices, and device-making equipment, including debit or credit cards, gift cards, or any other cards bearing magnetic stripes; equipment used for reading or making the same, such as skimming devices, card readers or magnetic stripe reading/encoding devices, embossers, tippers, card printers, or the accessories required to use the same; electronic components for assembling and installing skimming devices; soldering mats or soldering residue; notes or logs of PIN numbers or ZIP codes;

b.   Records, documents, or materials relating to cloned cards, including blank white plastic cards or debit, credit or gift cards that contains altered information on the card's magnetic stripe;

c.   Records, documents, or materials relating to EBT cards, including, personal identification number (PIN), card holder's name, card holder's account number and card holder's expiration date;

ii

       d.    Records, documents, or materials relating to ATM locations;

       e.    Cash or monetary instruments, including bundles of cash, as well as discrete stacks of cash totaling over $1,000, including their packaging or wrapping, and any records tending to show the source of such cash; any amount of postal money orders, private money orders (i.e., "Money Gram" money orders), or casino chips or other negotiable or transferable instruments;

       f.    Data, records, documents, or information (including electronic mail and messages) pertaining to obtaining, possessing, using, or transferring personal and/or financial transaction identification information for persons other than GAUDENZI, such as names, addresses, phone numbers, credit and debit card numbers, security codes, bank account and other financial institution account numbers, Social Security numbers, email addresses, IP addresses, as well as PIN numbers and passwords for financial institutions or internet service providers;

       g.    Storage locations, including records indicating the location, ownership or control of any storage lockers, storage garages, trailers, residences, hotel rooms, rental premises, vaults, safe deposit boxes, or other locations where any digital devices, cash or monetary instruments, or access devices or device-making equipment may be stored, as well as any keys or access devices required to access the same;

h.    Records, documents, or materials of who used, owned, or controlled the Mustang or the SUBJECT DEVICE at the time the things described in this warrant occurred;

i.    Records, documents, programs, applications, or materials pertaining to applications for, or use of, credit or debit cards, bank accounts, or merchant processor accounts;

j.    Data, records, documents (including e-mails), or information reflecting or referencing purchases of merchandise, securities, electronic currency, and other valuable things;

k.    Software, devices, or tools used to obtain, create, or use counterfeit or unauthorized checks, coupons, or access devices such as credit, debit, bank, and gift cards;

l.    Any documents or records relating to any bank accounts, credit card accounts, or other financial accounts;

m.    Records, documents, programs, applications, or materials relating to United States mail or mail matter;

n.    Contents of any calendar or date book stored on any of the digital devices;

o.    Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations;

p.    Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show address book information, including all stored or saved telephone numbers;

q.    Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to

iv

show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls;

r.    Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any of the digital devices and which relate to the above-named violations;

s.    Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received from any digital device and which relate to the above-named violations;

t.    Audio recordings, pictures, video recordings, or still captured images of United States mail or mail matter, whether opened or unopened, or relating to the possession or distribution of drugs or the collection or transfer of the proceeds of the above-described offenses; and

u.    Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof, including but not limited to the SUBJECT DEVICE.

v.   With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted;

ii.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

iv.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v.   evidence of the times the device was used;

vi.   applications, programs, software, documentation, manuals, passwords, keys, and other access devices that may be necessary to access the device or data stored on the device, to run software contained on the device, or to conduct a forensic examination of the device;

vii. records of or information about Internet Protocol addresses used by the device.

2.   As used herein, the terms "records," "information," "documents," "programs," "applications," and "materials" include records, information, documents, programs, applications, and materials created, modified, or stored in any form, including in

digital form on any digital device and any forensic copies thereof.

3.    As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## II.  SEARCH PROCEDURE FOR DIGITAL DEVICES

4.    In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.    Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall

complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant. The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b. The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i. The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the scope of items to be seized. The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the scope of items to be seized.

ii. The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase," "Griffeye," and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c. The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

d.    If the search determines that a digital device does not contain any data falling within the scope of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.    If the search determines that a digital device does contain data falling within the scope of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f.    If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the scope of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.    The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.    After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

5.   The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

6.   During the execution of this search warrant, law enforcement is permitted to: (1) depress FILLIPPO GAUDENZI's thumb and/or fingers onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of FILLIPPO GAUDENZI's face with -his eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

7.   The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not

apply to any search of digital devices pursuant to any other
court order.